## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WESTINGHOUSE AIR BRAKE | : | |
| TECHNOLOGIES CORPORATION | : | |
| (d/b/a WABTEC CORPORATION) and | : | Case No. 2:17-cv-010129-CB |
| WABTEC RAILWAY ELECTRONICS, INC. | : | |
| | : | |
| Plaintiffs, | : | |
| vs. | : | |
| | : | |
| MICHAEL BRATCHER, | : | |
| | : | |
| Defendant. | : | |

### PLAINTIFFS' BRIEF IN SUPPORT OF
### MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs, Westinghouse Air Brake Technologies Corp., d/b/a Wabtec Corporation and

Wabtec Railway Electronics, Inc. (collectively, "Wabtec"), by and through their undersigned

counsel, submit this Brief in support of their Motion for Preliminary Injunction.

## I.        INTRODUCTION

Wabtec requires a preliminary injunction to enjoin Defendant Michael Bratcher

("Bratcher") from continuing to cause Wabtec irreparable harm by his willful violation of his

non-competition/confidentiality agreement with Wabtec and misappropriation of Wabtec's

valuable trade secrets to usurp business opportunities from Wabtec for his clandestinely-formed

corporation, Railway Innovative Solutions, Inc. ("RIS").  RIS is being used as a conspiratorial

vehicle by Bratcher and other former Wabtec employees to engage in unfair and unlawful

competition with Wabtec.

Wabtec is the leading innovator in the development of Positive Train Control ("PTC"),

which is an advanced system designed to automatically stop a train before allowing certain

incidents to occur, such as train-to-train collisions, derailments caused by excessive train speed,

1

and unauthorized train entry into work zones.  Wabtec's industry-leading PTC system is known as Interoperable Electronic Train Management System ("I-ETMS®").  I-ETMS® has been selected to be the main technical architecture for PTC in North America

Bratcher has been an integral member of Wabtec's Signal & Train Management Solutions ("STMS") team since being hired on or about October 24, 2008.  On or about April 10, 2012, Bratcher was promoted to the position of Vice President of STMS.  At the time he began his employment with Wabtec, Bratcher entered into an Employee Non-Competition and Confidentiality Agreement (the "Non-Compete/Confidentiality Agreement") dated October 24, 2008.  The Non-Compete/Confidentiality Agreement prohibits Bratcher from, among other things, (a) making use of or disclosing any proprietary and/or confidential information and trade secrets of Wabtec during his employment and for five years after the termination of his employment; (b) working directly or indirectly for a competitor of Wabtec during his employment and for two years following the termination of his employment; (c) communicating with any customer of Wabtec for the purpose of soliciting goods or services which are the same or similar to goods or services of Wabtec during his employment and for three years following the termination of his employment; and (d) inducing or attempting to induce any employee of Wabtec to quit the employment of Wabtec or employing any person employed by Wabtec during the twelve month period immediately following his termination of his employment.

Unbeknownst to Wabtec until recently, Bratcher participated in the formation, operation and/or management of RIS; concealed his involvement with RIS; and used RIS to compete unfairly and unlawfully against Wabtec.  RIS was formed by Bratcher and his associates in or around October 2016.  Beginning in or around October 2016, Bratcher began to surreptitiously forward emails from his Wabtec email account to his personal email account

(mbrat62@me.com) related to Wabtec projects.  Among the emails Bratcher forwarded to his

personal email account were emails relating to potential and ongoing work for Wabtec

customers, Alaska Railroad Corp. ("ARRC") and Canadian National Railroad ("CN").  Bratcher

attempted to usurp, and at least in the case of ARRC succeeded in usurping, business from these

Wabtec customers on behalf of RIS.

      ARRC has been a customer of Wabtec for more than five years in connection with the

design, development and implementation of a Positive Train Control ("PTC") system.  Wabtec's

contracts with ARRC were largely performed by Bratcher's STMS team in Fort Worth, Texas.

Since in or around November 2016, Wabtec has experienced a large number of departures from

its Fort Worth STMS engineering group.  Wabtec subsequently learned that at least two key

engineers from the STMS team, Shawn Aslam and Jeff Ochoa, joined and currently are

employed by RIS.  On January 24, 2017, Bratcher advised Wabtec that he intended to retire.

Despite this announcement, Bratcher has remained a Wabtec employee and remained on the

Wabtec payroll through at least July 2017.  Within days of advising Wabtec of his intention to

retire, unbeknownst to Wabtec, an ARRC executive sent Bratcher a calendar invite to his

personal email address for a February 9, 2017 teleconference with the subject line "Proposal

review."  Because at this time Bratcher claimed to have "retired" from Wabtec, this "Proposal

review" sent to Bratcher's personal email address was not, and could not have been, related to

his duties as a Wabtec employee.  Again unbeknownst to Wabtec, in or around March 2017,

ARRC sent a calendar invite to, among others, Bratcher at his personal email address scheduling

a weekly conference call between RIS and ARRC entitled "Weekly RIS/ARRC status update

meeting."  This meeting was scheduled to take place every Friday from March 3, 2017 to May 5,

2017 — at a time when Bratcher was still on Wabtec's payroll.

Bratcher's usurpation of Wabtec business opportunities with ARRC on behalf of RIS is undisputed. Despite having entered into a contract with Wabtec to design, develop and implement a PTC system, ARRC admitted to Wabtec in a letter dated June 28, 2017 that ARRC had "entered into a contract with Railway Innovative Solutions, Inc. (RIS) on May 12, 2017 to assist with software development" for its new back office system, which was part of Wabtec's scope of work for ARRC.

Accordingly, Wabtec requires a preliminary injunction to enforce Bratcher's compliance with the terms of his Non-Compete/Confidentiality Agreement and to enjoin his further misappropriation of Wabtec's valuable trade secrets.

## II.  FACTUAL BACKGROUND

### A.  Wabtec's Business Operations and Trade Secrets

Wabtec is the leading innovator in the development of Positive Train Control ("PTC"), which is an advanced system designed to automatically stop a train before allowing certain incidents to occur, such as train-to-train collisions, derailments caused by excessive train speed, and unauthorized train entry into work zones. Wabtec's industry-leading PTC system is known as Interoperable Electronic Train Management System ("I-ETMS®"). PTC is a forward-looking and prevention-oriented system that anticipates upcoming future threats to rail safety and automatically negates those threats. PTC is inherently more reliable than systems that rely entirely on human control. Prior train signal systems used in many U.S. rail networks were reactive systems, which wait for train engineers to acknowledge alarms and do not prevent collisions under all circumstances.

In 2008, Congress enacted the Rail Safety Improvement Act of 2008. The Rail Safety Improvement Act required, among other things, that all Class I railroads and passenger rail

operators implement a mandatory PTC collision-avoidance system by December 31, 2015.

Congress subsequently extended this deadline to December 31, 2018.  In response to the Rail

Safety Improvement Act, several Class I railroads formed the Interoperable Train Control

Committee to develop PTC interoperability standards.

Based on the work of the Interoperable Train Control Committee, I-ETMS® was selected

to be the main technical architecture for PTC in North America (a different system called

Advanced Civil Speed Enforceability System was implemented solely for the Amtrak Northeast

Corridor between Boston and Washington, D.C.).  The non-profit Joint Council on Transit stated

in a May 2012 report entitled "Positive Train Control" that:  "As a result of its acceptance by the

[Interoperable Train Control Committee], Wabtec's [I-ETMS®] solution will become the main

technical architecture for positive train control in North America."  The report also identified

Wabtec as "probably the most significant vendor in the PTC space."

I-ETMS® introduced continuous GPS-based location and speed tracking for real-time

positioning, along with more sophisticated on-board wireless technology.  This allows for the

correction of potential train movement errors from a centralized control center, wherever the

train vehicle may be.  I-ETMS® consists of four subsystems – the Office Segment, Locomotive

Segment, Communication Segment, and Wayside Segment.  The Office Segment comprises a

computer-aided dispatching system and a positive train control server and database storing

information about tracks, including, without limitation, the make-up of trains operating on those

tracks (i.e., the number of and type of rail cars), work zones, and speed restrictions.  The Office

Segment issues movement authorities to locomotives based on information received from other

subsystems of I-ETMS®.  As part of the Office Segment, Wabtec created a proprietary

computer-aided dispatch system ("CAD") called Train Management Dispatch System

("TMDS®") and a proprietary Back Office Server system ("BOS") to interface and communicate with the other subsystems of I-ETMS®.

The intellectual property comprising the I-ETMS®, BOS, and TMDS® systems, including, without limitation, the specifications, structure, sequence and organization of the source code, the architecture of, the interface between, and other proprietary technical information related to the I-ETMS®, BOS, and TMDS® systems are trade secrets and proprietary, confidential information of Wabtec (collectively, the "Trade Secret Information"). The Trade Secret Information was developed at great expense to Wabtec over the course of a decade through Wabtec's substantial investment of capital and labor.  In an effort to ensure the secrecy of the Trade Secret Information, access to the Trade Secret Information is strictly controlled even within Wabtec to only those employees with a need to know such information for use in connection with their employment responsibilities.  Wabtec employees, including Bratcher, are bound by specific agreements and policies prohibiting the disclosure and restricting the use of Wabtec's confidential information, including, but not limited to, the Trade Secret Information. Such agreements and policies, among other things, (a) require all Wabtec trade secrets and/or confidential information to be kept secret; (b) forbid the disclosure of Wabtec's trade secrets and/or confidential information to any third party; (c) prohibit use of Wabtec's trade secrets and/or confidential information by the employee other than on behalf of Wabtec; and (d) condition vesting and retention of equity awards on refraining from specified conduct that could jeopardize Wabtec's trade secrets and/or confidential information.

B.     **Wabtec's Employment Relationship With Bratcher**

In or around October 2008, Wabtec acquired Transit Soft Design, LLC, a company of which Bratcher was the majority owner.  Pursuant to that acquisition, Bratcher personally made

6

millions of dollars.  Wabtec then retained Bratcher after the acquisition to be an officer of Wabtec.  Bratcher began his employment with Wabtec on or around October 24, 2008 as Assistant Vice President of STMS.  On or around April 19, 2012, Bratcher was promoted to Vice President of STMS.  In both positions, Bratcher's job responsibilities generally involved the development and implementation of the Trade Secret Information.

As part of his employment, on or about October 24, 2008, Bratcher entered into the Non-Compete/Confidentiality Agreement with Wabtec.  Over the course of the nine years he was employed by Wabtec, Bratcher gained extensive and detail-level knowledge of the Trade Secret Information, including, without limitation, the inner workings of Wabtec's I-ETMS®, BOS, and TMDS® systems.  This information was available to Bratcher only by virtue of his position and employment with Wabtec.  On or about April 19, 2012, Bratcher was promoted to the position of Vice President of STMS.  In the offer letter confirming his promotion to become Vice President of STMS, Bratcher specifically acknowledged and agreed that his Non-Compete/Confidentiality Agreement remained in full force and effect.

On January 24, 2017, Bratcher informed Wabtec that he purportedly wanted to retire. Based on information that Wabtec has subsequently learned, Bratcher's purported desire to "retire" actually was subterfuge to enable him to work full time for RIS in order to unfairly and unlawfully compete against Wabtec as described herein.  In the January 24, 2017 e-mail, Bratcher also asked "if there is some capacity that I can serve Wabtec from home until the end of March, or until I complete some personal affairs with my wife's health and can obtain similar healthcare insurance for my family as it would help us with this transition."  Over the next several months, Bratcher had discussions with Wabtec management regarding continuing to work as a Wabtec employee through at least the remainder of 2017 on an as-needed basis.  On

April 10, 2017, Bratcher was sent a letter changing his employment with Wabtec to work up to 20 hours per month at a salary of $5,000 per month.  Bratcher did not sign the April 10, 2017 letter; however, he continued to receive — and accept — salary payments from Wabtec of $5,000 per month in accordance with the April 10, 2017 letter.

**C.**     **Bratcher Formed RIS to Unfairly and Unlawfully Compete Against Wabtec**

In or around October 2016, Bratcher participated in the formation of RIS.  RIS is a corporation organized under the laws of Texas having a principal business address of 1335 Whisper Lane, Glen Rose, Texas 76043.  The Certificate of Formation for RIS identifies the registered agent as Brian Watts, who is Bratcher's personal accountant and previously formed corporations for other Bratcher businesses.  RIS is in the business of developing software for railroads including, without limitation, PTC, CAD and BOS systems in competition with Wabtec.  RIS employees use the email protocol _____@railwaysolutions.com.  Bratcher uses the email address Consultant1@railwaysolutions.com to conduct RIS business, which intentionally omits Bratcher's name in an effort to conceal his knowingly-improper activities on behalf of RIS.  In or around November 2016, Bratcher began working with a Wabtec employee to set-up a commercial grade AT&T connection to Bratcher's ranch.  The Wabtec employee communicated with Bratcher at the email address Consultant1@railwaysolutions.com.

Unbeknownst to Wabtec, from at least October 4, 2016 to November 29, 2016, Bratcher forwarded Wabtec e-mails to his personal email account related to potential and ongoing Wabtec projects, in violation of the Non-Compete/Confidentiality Agreement.  Bratcher then attempted to cover his tracks.  Beginning in December 2016, Dropbox automated emails began to appear in Bratcher's e-mail account stating that Dropbox "noticed that you recently deleted a large number of files from your Dropbox."  Thousands of files were deleted.  On February 10, 2017, Bratcher

was notified that the Dropbox was going to be canceled.  Before it was cancelled, however, the Dropbox was accessed at least twice, once on February 13, 2017 and again on February 14, 2017, from Keller, Texas, the location of Bratcher's then-residence.

After Bratcher returned his laptop, Wabtec attempted a forensic analysis of the hard drives.  Wabtec learned that the Bratcher's hard drives had been wiped.  However, the Bratcher hard drives were not reconfigured with the standard Wabtec image, which would normally occur when a hard drive is wiped for reuse.  Rather, upon information and belief, the Bratcher hard drive was specifically wiped to remove data.  The fact that Wabtec did not wipe the Bratcher hard drives pursuant to any internal protocol to reimage or reuse the Bratcher hard drives suggests that the Bratcher hard drives were wiped in an effort to conceal his activities.

Over the course of approximately the last eight months, Wabtec has experienced a large number of departures from its Fort Worth STMS engineering group.  Since the start of 2017, at least nineteen Wabtec employees have resigned from the Fort Worth location.  Wabtec has learned that RIS employs multiple former-Wabtec employees, including at least two key engineers from the STMS team, Shawn Aslam (former-Senior Software Engineer) and Jeff Ochoa (former-Senior Director of Systems Development).  Aslam uses the email address saslam@railwaysolutions.com to conduct RIS business; Ochoa uses the email address jochoa@railwaysolutions.com to conduct RIS business.

**D.     Wabtec's Relationship with ARRC**

ARRC is a Class 2 railroad extending from Seward and Whittier, passing through Anchorage to Fairbanks and into the interior of the state.  ARRC has been a customer of Wabtec for more than five years.  In 2015, specifically, Wabtec entered into a Master Service Agreement with ARRC (the "ARRC Master Service Agreement") to pursue a two-phased program to design,

develop, and implement Wabtec's I-ETMS® system.  The first phase implemented TMDS® to authorize train movements and deliver speed restrictions.  Wabtec also added a BOS to ensure train movements are received and safe.  Wabtec has accomplished the development of the BOS and TMDS® system through its key STMS employees in the Fort Worth office, including, but not limited to, Bratcher.  Wabtec continues to perform services for ARRC.

**E.**     **Bratcher's Usurpation of ARRC Business for RIS**

While at Wabtec, Bratcher was involved with the implementation of I-ETMS®, BOS, and TMDS® at ARRC.  As part of his responsibilities, Bratcher frequently communicated with representatives of ARRC, including but not limited to ARRC's Vice President of Information, Technology, and Telecommunications, Eileen Reilly ("Reilly").  On February 9, 2017, Reilly sent a calendar invite to Bratcher at his personal email address with the subject line "Proposal review."  At this time, Bratcher claimed to have retired from Wabtec so this "Proposal review" sent to Bratcher's personal email address was not, and could not have been, related to his duties at Wabtec or as a Wabtec employee.  On March 9, 2017, ARRC sent a calendar invite to, among others, Bratcher at his personal email address scheduling a weekly conference call between RIS and ARRC entitled "Weekly RIS/ARRC status update meeting" for every Friday from March 3, 2017 to May 5, 2017.

Rajendra Jadhav ("Jadhav"), President of Wabtec Electronics Group, is Wabtec's main point of contact with ARRC.  At ARRC, Jadhav principally communicated with Reilly or Bill O'Leary ("O'Leary"), President & CEO of ARRC.  Jadhav managed the ARRC business relationship and supervised Bratcher and the STMS team with respect to the development of proprietary software and code for implementation at ARRC.  Reilly and Jadhav spoke frequently

about the scope of Wabtec's work for ARRC, the budget for the multi-phased I-ETMS®

implementation, and everything in between.

On June 3, 2017, Jadhav emailed O'Leary, to update O'Leary on a change in the scope of

Wabtec's services for ARRC.  Jadhav wrote to inform O'Leary that Wabtec did not yet come to

an agreement on the scope reduction with ARRC for two primary reasons.  First, ARRC and

Wabtec could not reach an agreement regarding funding for the remainder of the project.

Second, Jadhav explained that Wabtec learned that ARRC engaged a third party to work on

Wabtec systems.  Jadhav warned O'Leary that "[t]his third party and ARRC, in turn, may be in

violation of [Wabtec's] IP.  This is certainly an unethical behavior that must be condemned and

stopped immediately."

On June 7, 2017, O'Leary replied to Jadhav's email, agreeing that Wabtec and ARRC

"have not yet been able to negotiate a modification to [their] contract," and stating that due to

this, ARRC has hired several contractors to "replace the CAD, BOS, and IVS functions in the

Wabtec office segment with a system that allows for the vital functions that meet ARRC's

operational requirements."  O'Leary alleged that none of these systems use Wabtec intellectual

property but was instead "being independently designed and developed from scratch."  O'Leary

claimed that the contractors' work "will result in a total replacement of the Wabtec CAD and

BOS."

In a June 28, 2017 letter to Wabtec, ARRC admitted that it had "entered into a contract

with Railway Innovative Solutions (RIS) on May 12, 2017 to assist with software development"

for its new back office system.  The letter further stated that RIS had recently notified ARRC that

it could no longer continue with the contract and ARRC has agreed to terminate the RIS contract.

**F.**     **Bratcher's Usurpation of CN Business for RIS**

CN is a Class I Canadian railway that serves Canada and the Midwestern and Southern United States.  CN has been, and continues to be, a customer of Wabtec.

On October 13, 2016, a CN employee e-mailed Bratcher at his Wabtec e-mail address, along with two other Wabtec employees, inquiring about tools Wabtec had or was developing to "improve visibility into train meets, movement planning, and train service plan (TSP) running time and exception management, and operations analytics."  The CN employee asked if they could "share with [him] what products [Wabtec] currently has, [or] is planning to have" and "whether we can set up demonstration with the Wabtec tool, and we can discuss next steps." That night, Bratcher forwarded the e-mail to his personal e-mail address.

Between October and December 2016, e-mails were exchanged between Bratcher, Gerry Puczko, Director of Project Management at Wabtec, and Robert Brown, a Wabtec consultant, regarding submitting a proposal to CN for population of CN's PTC data into TMDS®.  On December 15, 2016, Puczko stated that "CN still wants some kind of proposal" but the proposal probably wouldn't go out "until the new year."  Brown responded that he would pass along that information to CN; however, later that day, Bratcher e-mailed Brown, removing Puczko from copy, directing him to "Hold tight" on mentioning Wabtec's plan to submit a proposal to CN. On information and belief, Brown currently works for RIS.

The very next day, on December 16, 2016, CN employee, Robert Whitlock who formerly worked for Wabtec, sent an email to various other employees at CN copying Aslam, RIS' Director of Technology Solutions, that stated "I would like to put you in contact with a man named Shawn Aslam.  Shawn is an expert in trackline creation with Wabtec tools and would have the staff available to ramp up the subdiv turnups.  I would suggest contacting him for help. I can personally recommend him."  On December 17, 2016, Aslam sent a response email thanking

Whitlock and blind copying Bratcher at his personal email address on the entire email string.  On December 20, 2016, CN's Senior Manager of Operation Technology in Positive Train Control sent a meeting invite to Aslam to discuss services RIS could offer, which Aslam forwarded to Bratcher at his personal email address and RIS email address.

### III.    ARGUMENT

**A.    Wabtec Is Entitled to Preliminary Injunctive Relief**

**1.    Standard of Review**

"In determining whether to grant a preliminary injunction, a court must consider whether the party seeking the injunction has satisfied four factors:  (1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief."  *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d. Cir. 2010) (internal quotations and citations omitted).  Here, each of these factors decidedly weighs in favor of granting Wabtec preliminary injunctive relief.

**2.    Wabtec Is Likely to Succeed on the Merits of Its Claims**

**a.    Wabtec Is Likely to Succeed on the Merits of Its Misappropriation of Trade Secrets Claim under the DTSA**

The DTSA forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  Pursuant to the DTSA, a "trade secret" can be "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically,

photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep

such information secret, and (B) the information derives independent economic value, actual or

potential, from not being generally known to, and not being readily ascertainable through proper

means by, another person who can obtain economic value from the disclosure or use of the

information." 18 U.S.C. § 1839(3).

> Pursuant to the DTSA, "misappropriation" means:
>
> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the trade secret, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5).  According to the DTSA, "improper means" includes "theft, bribery,

misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage

through electronic or other means" and "does not include reverse engineering, independent

derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

> During the course of his employment and subject to his Non-Compete/Confidentiality

Agreement and other confidentiality obligations, Wabtec entrusted Bratcher with the Trade

Secret Information.  Bratcher had direct access to and knowledge of the Trade Secret

Information.  The Trade Secret Information entrusted to Bratcher is related to Wabtec's products

that are intended for use in interstate or foreign commerce — namely, the I-ETMS®, TMDS®

and BOS systems.  Wabtec implements its products, including the I-ETMS®, TMDS® and BOS

systems, throughout the United States, and internationally, and the Trade Secret Information obtained by Bratcher relates to these products.

Such technology and the methods associated with their use are confidential and proprietary trade secrets of Wabtec.  Wabtec derives economic value from the fact that the Trade Secret Information is not generally known or readily ascertainable to individuals or entities outside of Wabtec.  As described above, Wabtec has taken reasonable steps as part of its ongoing standard operating procedures to maintain the confidential nature of the Trade Secret Information.  These measures include password-protected databases, confidentiality and non-disclosure agreements, and limitations on dissemination of information on a need-to-know basis.  Wabtec also protects its proprietary information when it comes to third parties.  Additionally, prior to any disclosure of confidential or proprietary information, Wabtec requires third parties to sign a non-disclosure agreement.  Wabtec also uses document identifiers to classify its proprietary or confidential information.  For example, any document that might be disclosed to a third party under a non-disclosure agreement would be marked "CONFIDENTIAL."

Bratcher knew he had a duty to maintain the secrecy of the Trade Secret Information due, in part, to his acknowledgements of such under the Non-Compete/Confidentiality Agreement.  As described in detail above, Bratcher violated these duties by misappropriating the Trade Secret Information by, among other things, (a) disclosing Wabtec's confidential information to RIS; (b) using the Trade Secret Information to accelerate to market source code by RIS for PTC, BOS and/or CAD systems based on knowledge of the structure and architecture of the I-ETMS®, BOS and TMDS® systems; and (c) using the Trade Secret Information for RIS to unfairly and unlawfully compete against Wabtec and to usurp Wabtec business and/or business opportunities, including, for example, business from ARRC.

Using knowledge of the Trade Secret Information, Bratcher and RIS gained an unfair competitive advantage without having to expend effort, time and resources required to develop competing products.  Bratcher has utilized and is continuing to utilize the Trade Secret Information in connection with the development of competitive PTC, BOS and/or CAD systems, copied or derived from the Trade Secret Information, for his own use and financial gain. Bratcher will continue to disclose the Trade Secret Information in the course of his employment with RIS to accelerate to market competitive PTC, BOS and/or CAD systems that are based on or incorporate the Trade Secret Information, for financial gain.  Accordingly, Bratcher's actions constitute actual and threatened misappropriation in violation of the DTSA.

> **b.** **Wabtec Is Likely to Succeed on the Merits of Its Misappropriation of Trade Secrets Claim under PUTSA**

Similar to the DTSA, PUTSA authorizes a court to grant injunctive relief with respect to actual or threatened misappropriation of trade secrets.  *See* 12 Pa. Cons. Stat. § 5303(a) (2012). The statute defines "trade secret" broadly to include:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> (1)   Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2)   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id*. at § 5302.  Pennsylvania courts consider the following factors in determining whether particular information constitutes a trade secret:

> (1) the extent to which the information is known outside of [the company's] business; (2) the extent to which it is known by employees and others involved in [the company's] business; (3) the extent of the measures taken by [the company] to guard the secrecy of the information; (4) the value of the information to [the

company] and its competitors; (5) the amount of effort or money expended by [the company] in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Crum v. Bridgestone/Firestone N. Am. Tire, LLC*, 907 A.2d 578, 585 (Pa. Super. 2006).  In essence, "[t]he critical *indicia* for determining whether certain information constitutes a trade secret are substantial secrecy and competitive value to the owner." *Id.* (quoting *O.D. Anderson, Inc. v. Cricks*, 815 A. 2d 1063, 1070 (Pa. Super. 2003)).

Here, the Trade Secret Information is not generally known to, nor is readily ascertainable by, persons outside of Wabtec, and is not publicly available.  Indeed, the Trade Secret Information is the result of a significant investment of time and money on the part of Wabtec and is comprised of confidential commercial information.  The Trade Secret Information is extremely valuable and critical to the operation of Wabtec's business.  It would be extremely difficult, if not impossible, for a third-party to acquire or duplicate the Trade Secret Information by legitimate and lawful means.

As the industry-leader in PTC technology, as described in detail above, Wabtec clearly derives independent economic value from the secrecy of the Trade Secret Information.  Conversely, Bratcher and third-parties would obtain significant economic value from the disclosure and use of the Trade Secret Information.  As discussed, Wabtec has taken reasonable steps as part of its ongoing standard operating procedures to maintain the confidential nature of the Trade Secret Information.

It is likewise undeniable that Bratcher misappropriated the Trade Secret Information, as that term is defined in the PUTSA.  The PUTSA defines "misappropriation" as including:

(1)     acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; *or*

(2)     disclosure or use of a trade secret of another without express or implied

consent by a person who:

(i)     used improper means to acquire knowledge of the trade secret;

(ii)    at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

    (A)    derived from or through a person who had utilized improper means to acquire it;

    (B)    acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; ***or***

    (C)    derived from or through a person who owned a duty to the person seeking relief to maintain its secrecy or limit its use; ***or***

(iii)   before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*See* 12 Pa. Cons. Stat. § 5302 (2012) (emphasis added).

As discussed with respect to the DTSA, Bratcher misappropriated the Trade Secret Information by disclosing Wabtec's confidential information to RIS, and by using Wabtec's proprietary information to accelerate to market source code for PTC, BOS and/or CAD systems based on knowledge of the structure and architecture of Wabtec's I-ETMS®, TMDS®, and/or BOS systems. Using knowledge of the Trade Secret Information, Bratcher and RIS gained an unfair competitive advantage without having to expend effort, time and resources required to develop competing products. Bratcher will continue to disclose and utilize the Trade Secret Information in the course of his employment with RIS to accelerate to market competitive PTC, BOS and/or CAD systems that are based on or incorporate the Trade Secret Information for financial gain. Bratcher's actions, therefore, constitute actual and threatened misappropriation in violation of the PUTSA.

        **c.**      **Wabtec Is Likely to Succeed on the Merits of its Claim that Bratcher**

## Breached His Non-Compete/Confidentiality Agreement

A reasonable non-competition agreement entered into incident to an employment relationship will be enforced according to its terms.  *See Quaker Chem. Corp. v. Varga*, 509 F.Supp.2d 469, 476 (E.D. Pa. 2007) (citing *Sidco Paper Co. v. Aaron*, 351 A.2d 250, 252 (1976)); *see also Synthes USA Sales, LLC v. Harrison*, No. 2012–12021, 2014 WL 11210394, at *7 (Pa. Commw. Ct. May 19, 2014) ("Where a restrictive covenant meets the test of reasonableness, it is prima facie enforceable in equity.").[1]

As described in detail, above, Bratcher voluntarily entered into the Non-Compete/Confidentiality Agreement in consideration for his employment with Wabtec and incident to his employment relationship.  The restrictions of the Non-Compete/Confidentiality Agreement are reasonable to protect Wabtec's legitimate business interests.  *See Synthes USA Sales, LLC v. Harrison*, 2014 WL 11210394, at *7 ("Pennsylvania courts recognize that the trade secrets of an employer, customer goodwill and specialized training and skills acquired from the employer are all legitimate interests protectable through a general restrictive covenant.") (citing *Thermo–Guard, Inc. v. Cochran*, 596 A.2d 188, 193–94 (Pa.Super.1991)).

Pursuant to Paragraph 7 of the Non-Compete/Confidentiality Agreement, during his employment with Wabtec and for a period of five years after his termination for any reason,

---

[1]  Bratcher's Non-Compete/Confidentiality Agreement is governed by Maryland law.  Maryland law is in accord that a reasonable restrictive covenant in an employment contract is enforceable according to its terms.  *See TEKSystems, Inc. v. Bolton*, No. RDB-08-3099, 2010 WL 447782, at *4 (D. Md. Feb. 4, 2010) (citing *Ruhl v. F. A. Bartlett Tree Expert Co.*, 225 A. 2d 288 (1967)) ("in determining whether a restrictive covenant in an employment contract is enforceable, courts assess 'whether the particular restraint is reasonable on the specific facts'"); *Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 641 (D. Md. 1998) (same).  Moreover, Maryland — like Pennsylvania — has adopted the Uniform Trade Secrets Act.  *See* Md. Code, Com. Law § 11-1201 et seq.  Thus, the scope of protection for misappropriation of trade secrets under Maryland law is substantially identical to that of Pennsylvania.  *See id.* at § 11-1201(c).  A choice of law analysis, therefore, is unnecessary because there is no conflict of law.  *See Lookout Windpower Holding Co. v. Edison Mission Energy*, 714 F. Supp. 2d 547, 549-550 (W.D. Pa. 2010) ("[A] choice of law analysis is unnecessary, indeed discouraged, at this point because there is no apparent conflict of law.").

Bratcher is prohibited from "directly or indirectly making use of or disclosing any proprietary and/or confidential information or trade secrets concerning any matters affecting or relating to the business of Wabtec that is known or should be known to [Bratcher] to be, or Wabtec designates to be, proprietary and/or confidential information or trade secrets, to any person or entity other than individuals specifically authorized by Wabtec to receive such information or trade secrets except as may be required by law."

Bratcher certainly knew the Trade Secret Information constituted proprietary and/or confidential information or trade secrets.  Wabtec did not authorize Bratcher to directly or indirectly disclose the Trade Secret Information to RIS and/or make use of the Trade Secret Information for his own or RIS' benefit.  Bratcher, therefore, breached the Non-Compete/Confidentiality Agreement by disclosing the Trade Secret Information to RIS and/or making use of the Trade Secret Information for his own or RIS' benefit through the conduct alleged herein including, without limitation, using the Trade Secret Information in connection with the business of RIS to develop competing systems for Wabtec's customers ARRC and CN during and directly following his employment with Wabtec.

Additionally, pursuant to Paragraph 2 of the Non-Compete/Confidentiality Agreement, during his employment with Wabtec and for a period of two (2) year(s) following the termination for any reason, Bratcher is prohibited for working directly or indirectly "on behalf of any person or business entity which develops, produces, markets or services any product or service with which Wabtec is involved, or which is in competition with or similar to the goods and/or services of Wabtec" in the United States of America and/or any country in which Wabtec is or has been doing business during the year prior to Bratcher's termination.

RIS develops, produces, markets, and services products and services that are similar to

and compete with the goods and services of Wabtec. Such products and services include, but are not limited to PTC, BOS and/or CAD systems.  Bratcher participated in the formation, operation and/or management of RIS and conducts business on behalf of RIS using the email address Consultant1@railwaysolutions.com.  Thus, Bratcher breached his Non-Compete/Confidentiality Agreement by working for RIS, a corporation that competes directly with Wabtec for business by developing PTC, BOS and/or CAD systems, and in particular for Wabtec's own customers.

Finally, pursuant to Paragraph 3 of the Non-Compete/Confidentiality Agreement, for a period of three (3) year(s) following his termination for any reason Bratcher is prohibited from communicating or with encouraging others to communicate "with any customer of Wabtec for the purpose of soliciting, marketing or providing, goods and/or services which are the same as or similar to the goods and/or services of Wabtec.  The phrase "any customer of Wabtec" is defined by the Non-Compete/Confidentiality Agreement to include:  (a) existing customers of Wabtec during the one year prior to Bratcher's termination, and (b) all third parties Wabtec is and/or was actively engaged in negotiations with to become a customer of Wabtec during the year prior to Bratcher's termination.  Bratcher breached the Non-Compete/Confidentiality Agreement by communicating and encouraging others associated with RIS to communicate with ARRC and CN for the purpose of providing services which are the same as those provided by Wabtec.

The foregoing restrictions of the Non-Compete/Confidentiality Agreement  are reasonable in both scope and duration.  *See Quaker Chem. Corp. v. Varga*, 509 F.Supp.2d 469 (citing cases and holding that worldwide covenants not to compete are reasonable and enforceable for companies that conduct business worldwide); *Healthcare Servs. Grp., Inc. v. Fay*, No. 13-66, 2013 WL 2245683, at *8 (E.D. Pa. May 22, 2013 (citing *Worldwide Auditing Servs., Inc. v. Richter*, 587 A.2d 772, 776 (Pa.Super.Ct.1991)) ("The restrictive covenants

prohibit Fay and Konopka from working for any competitor of Healthcare within the continental

United States for two years after the termination of each one's employment. The two-year time

period is reasonable."); *John G. Bryant*, 369 A.2d at 1166 (enforcing three year restrictive

covenant); *Volunteer Firemen's Ins. Servs., Inc. v. CIGNA Property and Casualty Ins. Agency*,

693 A.2d 1330, 1338 (Pa.Super.1997) (same); *DeMuth v. Miller*, 652 A.2d 891, 900

(Pa.Super.1995) (enforcing five year restrictive covenant).

    Accordingly, Wabtec is likely to succeed on its claims that Bratcher breached the

foregoing restrictions of the Non-Compete/Confidentiality Agreement

### 2.    <u>Wabtec Will Suffer Irreparable Harm Without a Preliminary Injunction</u>

    As a matter of fact and law, Wabtec will suffer irreparable harm if a preliminary

injunction is not granted and Bratcher is permitted to continue to use and disclose the Trade

Secret Information to unfairly and unlawfully compete against Wabtec.  That Wabtec will suffer

irreparable harm, in fact, is undisputed.  Bratcher specifically agreed in the Non-

Compete/Confidentiality Agreement that a breach of its provisions will cause Wabtec irreparable

injury entitling Wabtec to injunctive relief as follows:

> The parties recognize that the services to be rendered by EMPLOYEE while
> he/she is employed by Wabtec are special and unique and that EMPLOYEE's
> employment with Wabtec, of necessity, provides EMPLOYEE with specialized
> knowledge and skills, and that **Wabtec will be irreparably harmed in the event
> EMPLOYEE were to use his/her special training and knowledge in
> competition with Wabtec in violation of the Agreement**. In addition to any
> other rights and remedies available to Wabtec at law or otherwise, **Wabtec shall
> be entitled to an injunction to be issued by any court of competent
> jurisdiction restraining EMPLOYEE from committing any actual or
> threatened violation of this Agreement**.

Non-Compete/Confidentiality Agreement ¶ 8 (emphasis added).  Thus, irreparable harm in these

circumstances is admitted and therefore constitutes evidence of such harm.  *See USA Techs., Inc.*

*v. Tirpak*, No. 12–2399, 2012 WL 1889157, at *6 (E.D. Pa. May 24, 2012) ("the parties'

agreement that the breach of a contract would result in irreparable harm constitutes evidence of such harm.").

Additionally, the actual or threatened misappropriation of trade secrets constitutes irreparable harm as a matter of law.  *See Ecolaire,* 542 F. Supp. at 205; *Solar Innovations, Inc. v. Plevyak*, No. 1110 MDA 2012, 2013 WL 11272849, at *13 (Pa. Super. Ct. March 20, 2013) ("Pennsylvania courts have consistently held threatened or actual use of a former employer's trade secrets at a competitor cannot be remedied through money damages and is 'the type of injury that most warrants' injunctive relief.") (citation omitted); *Air Prods.,* 2003 WL 22917491, at *13 ("The potential disclosure of misappropriated trade secrets satisfies the irreparable harm requirement."); *see also Chmura v. Deegan,* 581 A.2d 592, 537 ("Chmuras' allegation that Deegan was misappropriating trade secrets supplied the irreparable harm requirement for the issuance of the preliminary injunction") (Pa. Super. Ct. 1990) (Cirillo, J., concurring).

Pennsylvania courts have also specifically found that the disruption of "customer relationships," as occurred with at least ARRC here, constitutes irreparable harm.  *See West Penn Specialty MSO, Inc. v. Nolan,* 737 A.2d 295, 299 (Pa.Super.1999); *Santoro v. Morse*, 781 A.2d 1220, 1226 (Pa.Super.2001); *Carlini v. Highmark*, 756 A.2d 1182, 1188 (Pa.Cmwlth.2000); *Robert Clifton Assoc., Inc. v. O'Connor*, 487 A.2d 947, 950–52 (Pa.Super.1985).

### 3.     Granting Injunctive Relief Will Not Result in Greater Harm to Bratcher

Wabtec seeks a preliminary injunction simply to require Bratcher to comply with the terms of his Non-Compete/Confidentiality Agreement to prevent further misappropriation of Wabtec's Trade Secret Information to usurp Wabtec business and business opportunities and unfairly and unlawfully compete against Wabtec.  There is no countervailing harm to Bratcher from being required to comply with the obligations of his Non-Compete/Confidentiality Agreement to which he voluntarily agreed.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v.*

*Napolitano*, 85 F.Supp.2d 491, 496 (E.D.Pa.2000) ("The self-inflicted nature of any harm suffered by the wrongdoer . . .  weighs heavily in favor of granting preliminary injunctive relief.") (citing *Pappan Enters., Inc. v. Hardee's Food Sys.*, Inc., 143 F.3d 800, 806 (3d Cir.1998)); *see also Quaker*, 509 F.Supp.2d at 480 ("the fact that Varga, by resigning from Quaker and joining Stuart in spite of knowing about the noncompete covenant, brought this dispute on himself weighs against him here."); *Graphic Mgmt. Assocs. v. Hatt*, 1998 WL 159035, at*1 (E.D.Pa. Mar.18, 1998) (refusing to allow a "high level officer of a company who betrayed his employer ... to circumvent a covenant not to compete"); *Nat'l Bus. Servs., Inc. v. Wright*, 2 F.Supp.2d 701, 709 (E.D.Pa.1998) ("[The employee] voluntarily left [the former employer], with full knowledge that [the former employer] would enforce the covenants against her; this factor is worth considering in balancing the harm to the parties."). Accordingly, the balance of harms overwhelmingly favors granting injunctive relief.

### d.    The Public Interest Favors Granting A Preliminary Injunction

The Third Circuit has recognized that [t]here is a generalized public interest in upholding the inviolability of trade secrets and enforceability of confidentiality agreements." *Bimbo Bakeries*, 613 F.3d at 102.  Because Wabtec has demonstrated a likelihood of success on its misappropriation of trade secret claims under the DTSA and PUTSA as well as on its claim that Bratcher breached his Non-Compete/Confidentiality Agreement, injunctive relief is warranted without detailed inquiry into this element.  *See SI Handling*, 753 F.2d at 1265 (finding unnecessary an "extended analysis of the public interest [because] extensive precedent supports an injunctive remedy where the elements of a trade secret claim are established").

In any event, the public interest favors enforcement of freely-negotiated confidentiality and non-competition agreements.  *See Fisher Bioservices, Inc. v. Bilcare, Inc.*, No. 06-567, 2006 U.S. Dist. LEXIS 34841, at *67 (E.D. Pa. May 31, 2006) (holding that injunctive relief serves

the public interest if it will "discourage . . . the wrongful use of confidential information and trade secrets and the disavowal of freely contracted obligations.") (internal citations and quotations omitted); *Quaker*, 509 F. Supp. 2d at 481 ("allowing the Defendant to freely violate his restrictive covenant ... would encourage Plaintiff's other employees to violate their restrictive covenants. Restrictive covenants only have value if they are enforced.") (citation omitted); *Nextgen Healthcare Info. Sys., Inc. v. Messier*, 2005 WL 3021095, at *13 (E.D. Pa. Nov. 10, 2005) ("There is an important public interest in enforcing contracts voluntarily entered, particularly those entered by knowledgeable and experienced businessmen...."); *Wright*, 2 F. Supp. 2d at 709 ("The public interest is best served, in this case, by upholding the restrictive covenants...."); *Hatt*, 1998 WL 159035, at *19 ("Preventing Mr. Hatt from breaching the restrictive covenant with his former employer will discourage unfair competition, the misappropriation and wrongful use of confidential information and trade secrets, and the disavowal of freely contracted obligations.").

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion should be granted and the Court should issue the proposed Preliminary Injunction Order submitted by Wabtec.

Dated:  August 15, 2017                              Respectfully submitted,

                                                     /s/ *Thomas E. Birsic*
                                                     Thomas E. Birsic
                                                     PA Bar No. 31092
                                                     Curtis B. Krasik
                                                     PA Bar No. 81150
                                                     K&L GATES LLP
                                                     K&L Gates Center
                                                     210 Sixth Avenue
                                                     Pittsburgh, PA 15222
                                                     Telephone: (412)-355-6500
                                                     Facsimile: (412)-355-6501
                                                     Email: thomas.birsic@klgates.com

25

Email: curtis.krasik@klgates.com

*Counsel for Plaintiffs, Westinghouse Air Brake Technologies Corporation and Wabtec Railway Electronics, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2017, I served a true and correct copy of the foregoing

document by hand delivery on the following:

Michael Bratcher
259 Boling Ranch Road
Azle, TX 76020

/s/ *Curtis B. Krasik*
Curtis B. Krasik